# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2479

_____

Janet R. Kerns,                              *

                                              *

            Plaintiff-Appellant,      *

                                              *   Appeal from the United States

v.                                       *   District Court for the

                                              *   Southern District of Iowa.

Capital Graphics, Inc.,           *

doing business as Clarinda Company,   *

                                              *

            Defendant-Appellee.      *

_____

Submitted: April 19, 1999
Filed: June 2, 1999

_____

Before MCMILLIAN, LOKEN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Janet R. Kerns sued her employer, Capital Graphics, Inc., for discriminating against her on the basis of gender and retaliating against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and the Iowa Civil Rights Act, Iowa Code §§ 216.1 et seq. The district court granted the defendant's motion for summary judgment, and Kerns appeals. She asserts that the district court erred in granting summary judgment and the defendant's motion to strike portions of her affidavit and statement of facts. We affirm.

I.

At the time relevant here, Janet Kerns was a personnel administrator for Clarinda Company, a division of Capital Graphics. She was involved in the administration of personnel matters in Clarinda's two Iowa facilities. In 1995 Ron Castiglioni became Clarinda's president. By all accounts many people found Castiglioni a difficult person with whom to work, regardless of their gender. Both male and female employees testified that he accused them of incompetence, undercut their authority and threatened to fire some of them; one of these male employees testified that he ultimately quit because of Castiglioni.

In a January 1996 meeting with Castiglioni, Kerns told him that two female employees had complained about his failure to post a position opening and his filling it with a male employee. She also reported that there were rumors that the company was creating a position for another male employee. There was no company policy requiring the posting of openings, and Castiglioni told Kerns that the decision was his to make and that the employee who had obtained the position would have otherwise left the company. In this same meeting Castiglioni asked Kerns about Kevin Andersen, the general manager of the Atlantic facility.[1] He wondered whether she had seen Anderson leave work early on Fridays. Castiglioni said he had heard that Andersen was showing preferential treatment to a supervisor, Alicia McCollum, who was also leaving Fridays at the same time. Castiglioni asked if there was anything "going on" between them; Kerns answered no.

Kerns had the impression that Castiglioni was asking her to look into the matter, and she proceeded to question Andersen and McCollum about their time off and reviewed their attendance records. When Andersen asked why she was asking about his days off, she told him that Castiglioni had heard there was something going on and

---

[1]At that time Kerns reported to both Andersen and the general manager of the Clarinda facility, Frank Nowakowski.

asked her to investigate it. Andersen was extremely angry to hear this and convened a meeting of his staff to deny that he and McCollum were having an affair. Kerns then sent a memo to Castiglioni, with copies to Andersen, McCollum, and Ed Welch, Castiglioni's predecessor as president. This memo stated that she had reviewed the attendance records, that the "insinuations of a sexual nature" between Andersen and McCollum were "totally and absolutely unfounded," and that it was "very disturbing that all someone has to do with their time is to build rumors and gossip which can cause harm to two families." Two other employees, Ed Wimberley and Steve Ethofer, testified that Castiglioni had told them he had asked Kerns to look into the situation.

After Castiglioni read Kerns' memo, he faxed it to Doug Friedrich, president of Capital Graphics, because he wanted to discuss a response. Castiglioni told Friedrich that he had not ordered Kerns to conduct an investigation, but had only asked her if she had noticed any preferential treatment. Friedrich suggested firing Kerns, but Castiglioni said he would prefer just restricting her discretion so as to avoid such problems in the future.

Castiglioni chastised Kerns for her actions and accused her of incompetence and of violating the company confidentiality policy. He sent her a memo expressing his displeasure. The memo stated that he had not authorized her actions, that she was not empowered to take "unilateral action," and that she would be fired for any subsequent exercise of poor judgment. He said that she needed his approval for any action outside her normal day-to-day activities and that she should check with him before issuing any memos, filing any reports, or doing anything out of the ordinary. He took steps to increase her supervision. He had her report directly to him, instead of to Andersen and Frank Nowakowski, had her move to a smaller office closer to his, and had her spend more time at the Clarinda facility. After the personnel office was eventually relocated to Clarinda where the rest of the administrative offices were, Castiglioni himself took over certain mail delivery that Kerns had previously taken care of and for which she had received travel reimbursement.

3

Within the next several weeks, Castiglioni had occasion to chastise Kerns for several other actions. One incident began with a memo from Kerns to Castiglioni, Friedrich, Welch, Andersen, Nowakowski, and chief financial officer Dan Smith. In this memo Kerns suggested a change in the company's treatment of vacation time for re-hires. Castiglioni wrote her back to say that her suggestion would be costly and that each case should be handled on an individual basis, with the opportunity for the plant manager to justify exceptions. He expressed dismay that she had sent her memo to so many people and said that her circulation of the memo had violated his earlier order.

Clarinda terminated sales representative Michelle Quintana at around the same time. Castiglioni took two documents from Quintana's personnel file to use in drafting a severance package and then gave the file to his secretary. She forwarded the file to Kerns and told her she could send it to Quintana. Even though Kerns noticed that the two documents were missing, she sent the file without speaking to Castiglioni. When Castiglioni learned of this, he sent Kerns a memo saying "it would seem that we are continuing to have a communication problem." Sending the incomplete file was "another example of you taking action without authorization or review by me prior to your taking said action."

The day before Castiglioni sent that memo, Kerns had sent him an unrelated memo requesting a performance review and saying that all the exempt employees other than the general managers had been reviewed. Castiglioni sent her memo back annotated with his handwritten responses. He pointed out that at least 6 exempt employees had not been reviewed and processed. He wrote, "Your statement would seem to be incorrect. Perhaps you had better *always* check your records before making inaccurate statements as above!"

Finally, on March 27, a little over a week after these memo exchanges, Castiglioni sent Kerns a final memo after learning that she had told an employee that the individual plant managers were to decide how to handle vacation reinstatement. He said that that information should not have been passed on to the employee and that she

4

may have put manager Andersen "in a very compromising position." Castiglioni also said in his memo, "Please stop taking my responses out of context! Your actions continue to put others in very precarious positions and this action on your part must stop! Now! Immediately!" This memo upset Kerns. She went to Nowakowski and quit. Her duties were then given to two other women, Carolyn Jennings and Joan Wallace.

Kerns filed for unemployment benefits and she filed discrimination charges with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC). She claimed that Castiglioni had treated her differently because she was a woman and that he had retaliated against her for investigating a potential sexual harassment situation. Initially the company had not contested the application for unemployment benefits, but Friedrich decided to appeal the decision a little over a week after the company was informed of the charges. The deadline for doing so had already passed, but he claimed that he and Castiglioni had just been told that the decision awarding benefits indicated that Kerns had quit because of a change in her "contract" and she had never had one. The Iowa Job Service Division determined that it lacked jurisdiction to consider an untimely appeal, and Kerns' benefits continued without interruption. She filed an additional charge with the ICRC, however, alleging that the company's appeal was in retaliation for her civil rights complaint.

Kerns subsequently filed this case in federal district court. She styled her complaint as a petition. It alleged that the "[d]efendant's different treatment and forced termination" were discriminatory and thus violated Title VII and Iowa law, that filing the untimely appeal was an act of retaliation in violation of Title VII and Iowa law, and that Capital Graphics had retaliated against her for consulting an attorney about its actions in violation of Iowa public policy.

The district court granted summary judgment in favor of Capital Graphics on all claims. The court indicated that even if Kerns had established a prima facie case of gender discrimination, her claims failed because she had not presented direct evidence

5

that she was discriminated against and she had not shown that the proffered reasons for the employer's actions were pretextual. The court also decided her retaliation claims could not succeed because of the failure to show pretext, and it dismissed her public policy claim as well. Kerns appeals the judgment dismissing all her claims with the exception of the public policy claim which she has abandoned.[2]

## II.

Summary judgment is reviewed de novo and is only proper if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Montgomery v. John Deere & Co., 169 F.3d 556, 559 (8th Cir. 1999).

## A.

To establish a prima facie case for discrimination, Kerns had to present evidence showing that she suffered an adverse employment action and some evidence of discriminatory motive behind that action. See Johnson v. Legal Servs. of Ark., Inc., 813 F.2d 893, 896 (8th Cir. 1987).[3] Kerns has failed to make a prima facie case

[2]Kerns also asserts that the district court erred in striking portions of her affidavit and statement of fact. We have examined the portions the parties say were stricken and conclude that Capital Graphics would have been entitled to summary judgment even if the entire affidavit and statement of fact had been admitted. Any error by the district court was therefore harmless and thus not a basis for reversal. See United States v. Goodson, 155 F.3d 963, 969 (8th Cir. 1998).

[3]Iowa has adopted the federal framework for evaluating discrimination claims under its state law, see Hulme v. Barrett, 449 N.W.2d 629, 631-33 (Iowa 1989). Iowa courts have held that the relevant provisions in the state civil rights statutes are patterned after Title VII and that federal case law is "instructive" in interpreting those provisions. See Brine v. Univ. of Iowa, 90 F.3d 271, 274 (8th Cir. 1996); Smith v. ADM Feed Corp., 456 N.W.2d 378, 382 (Iowa 1990).

because she has not demonstrated that she suffered adverse employment action. The adverse employment action must be one that produces a "material employment disadvantage." Cross v. Cleaver, 142 F.3d 1059, 1073 (8th Cir. 1998). Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, see id. at 1073, as would circumstances amounting to a constructive discharge, see Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 732 (8th Cir. 1996). Minor changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action, however. See Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994).

Kerns argues that she was constructively discharged. A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions. See Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281, 284-85 (8th Cir. 1993). Although Kerns has offered evidence to show that Castiglioni's offensive behavior was especially bad in regard to women, she has not shown that his actions created a hostile work environment for her or that his behavior towards other women contributed to her decision to leave the company. Cf. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574-75 (8th Cir. 1997). In fact, she has not even demonstrated that she was aware of all of the incidents before she left Clarinda. She claims that she left because the company forced her to work with a sexist supervisor who accused her of incompetence after she did what he had asked her to do, subjected her to close scrutiny, and took away her discretionary authority. There was no change in her job title, benefits, or salary, however. Although she claims to have been stripped of her discretionary authority, she has not described what authority she formerly had or explained why it was material to her employment. She has not shown that a reasonable person would have felt forced to leave when faced with these conditions.

7

The evidence she presents is also inadequate to show other adverse employment action. Castiglioni criticized her, but there is no evidence showing that this criticism had any formal effect on her employment status. She has not alleged that the loss of discretionary authority impeded her potential for job advancement or otherwise materially impacted her employment. The other actions she cites also fail to qualify as material employment disadvantage: changing the line of her reporting, increasing the proportion of time she spent at Clarinda, and moving her office closer to Castiglioni. Although the decision to stop reimbursing her for carrying mail between the plants had some monetary effect, this arrangement did not appear to have been a term or condition of her employment.

Although her failure to establish an essential element of her prima facie case is dispositive, we note the district court did not err in ruling that she also failed to present either direct evidence of discriminatory intent or evidence of pretext sufficient to overcome the justification for the actions taken against her. In a case without direct evidence of discrimination, the McDonnell Douglas burden-shifting analysis is used. McDonnell Douglas v. Green, 411 U.S. 792, 802-05 (1972); see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

Direct evidence is evidence of conduct or statements by persons involved in the decisionmaking process that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision. See Browning v. President Riverboat Casino- Missouri, Inc., 139 F.3d 631, 634 (8th Cir. 1998). Such evidence might include proof of an admission that gender was the reason for an action, discriminatory references to the particular employee in a work context, or stated hostility to women being in the workplace at all. Compare id. at 635; Stacks v. Southwestern Bell, 27 F.3d 1316, 1323 (8th Cir. 1994) with Rivers-Frison v. Southeast Mo. Community Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998). Kerns relies on evidence that Castiglioni made sexist and sexual comments and that the company was aware of at least some of these. None of the statements related either to

8

Kerns herself or the abilities of women employees, however.[4]  There is no direct evidence that Castiglioni took disciplinary actions against Kerns because she is female, and therefore the McDonnell Douglas analysis should be used rather than the mixed motive test of Price Waterhouse v. Hopkins, 490 U.S. 228, 248-50 (1989).

In addition to a prima facie case, McDonnell Douglas requires a plaintiff to show that an employer's legitimate, non-discriminatory reason for its action was pretextual. 411 U.S. at 802-05.  Kerns has not shown reason to doubt that Castiglioni's disapproval of her work performance motivated the disciplinary steps he took.  She claims he was inconsistent about whether he had asked her to investigate Anderson and McCollum, but that does not undermine his stated unhappiness with her handling of the situation as a whole.  Cf. Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1023-24 (8th Cir. 1998) (adequate evidence of pretext where employer gave entirely different reasons at different times).  She has not disputed that she made errors at various points, for instance in claiming that all other exempt employees had been reviewed when they had not, or that her actions produced undesirable consequences for the company.  Such consequences included disruption caused by her investigation of Andersen and McCollum, the need to resend Michelle Quintana's files, and the dissemination of sensitive information about reinstatement of vacation time.  The facts that she had

[4]Kerns offered a variety of evidence in the attempt to prove that Castiglioni was biased against women.  When he became president, he had excluded Kerns and controller Carolyn Jennings from management meetings which then had no women. Kerns and Paul Reed, Clarinda's chief operating officer, had both witnessed Castiglioni speak to Jennings in a "loud, arrogant" manner.  Reed told Castiglioni's superior, Capital Graphics president Doug Friedrich, that he had heard Castiglioni make sexual comments to female employees and that Castiglioni's attitude and behavior towards women was damaging to the company.  Friedrich testified that after Kerns had left the company, he saw a memo reporting Castiglioni's statement, "I hate women.  I was an indentured servant to one for over 25 years, and I'm still paying for it."  At various times, three women at Clarinda claimed to have been sexually harassed by Castiglioni, but Kerns has not alleged she was sexually harassed by him or anyone else.

9

received good performance reviews in the past and that the company's sexual harassment policies might have required her to take certain steps were not enough to show that Castiglioni's assertions that she demonstrated poor judgment in carrying out particular tasks were pretextual. See Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (prior satisfactory evaluations fail to render more recent negative evaluations inherently untrustworthy).

B.

Kerns has also appealed the dismissal of her retaliation claims, but these claims fail both on procedural grounds and on their merits. The nature of Kerns's claims has changed over the course of the litigation. Her complaint alleged retaliation based on the company's untimely appeal of her unemployment benefits after learning that she had filed with the ICRC. Without moving to amend her complaint, she later framed her arguments around Castiglioni's reactions to her statements about how he was handling various open positions within the company. She has now abandoned the argument that the company retaliated against her by filing the untimely appeal because she failed to brief the issue on appeal, see Fed. R. App. P. 28(a)(4), and she has never properly pleaded the claim that she was disciplined in retaliation for opposing unlawful employment practices, see Pulla v. Amoco Oil Co., 72 F.3d 648, 658 (8th Cir. 1995).

Both of these retaliation arguments would also fail on their merits. Kerns needed to present evidence of adverse employment action caused by her engaging in protected activity. See Stevens v. St. Louis Univ. Med. Ctr., 97 F.3d 268, 270 (8th Cir. 1996); Hulme v. Barrett, 449 N.W.2d 629, 633 (Iowa 1989). Her agency filings were protected conduct under 42 U.S.C. § 2000e-3(a) and Iowa Code 216.11(2), and there is evidence that the company's belated appeal could have been retaliatory because of the suggestive timing. The agency ultimately refused to entertain the appeal, however, and she has not shown that the company's action otherwise inflicted any material employment disadvantage. In regard to her subsequent theory, even if one assumes that her relaying the concerns of other employees qualifies as protected opposition, see

Montadon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (requiring opposition to practices plaintiff reasonably believed were unlawful), she failed to present adequate evidence of adverse employment action or pretext to sustain a retaliation claim. See id. at 359 (applying burden-shifting analysis to Title VII retaliation claim).

C.

After carefully examining the record, we conclude the district court did not err in granting summary judgment to Capital Graphics. The judgment is therefore affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.