# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3551

_____

Jessica T. Devin,                        *
                                         *
    Plaintiff -Appellant,        *
                                         *    Appeal from the United States
    v.                           *    District Court for the
                                         *    District of Minnesota.
Schwan's Home Service, Inc.,             *
                                         *
    Defendant - Appellee.        *

_____

Submitted: May 18, 2007
Filed: July 6, 2007

_____

Before BYE, SMITH, and BEAM, Circuit Judges.

_____

BYE, Circuit Judge.

    Jessica T. Devin was employed by Schwan's Home Services, Inc. (Schwan's) as a sales and delivery driver, otherwise known as a Route Manager. After her resignation, she brought an action against Schwan's asserting claims of gender discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17 and the Minnesota Human Rights Act,

Minn. Stat. 363A.03.[1]  The district court[2] granted Schwan's motion for summary judgment.  We affirm.

I

Schwan's sells a variety of frozen foods, meats, and dairy products via a truck delivery route system.  Drivers called Route Managers (RMs) make deliveries, collect payments, and solicit customers.  Schwan's employed Devin as an RM from January 2003 to January 2004 at its distribution center in Savage, Minnesota (Savage Depot).  Devin was hired by Pat Dero.  Soon after, Joey Gilb became the Savage Depot Sales Manager and Devin's supervisor.  When Devin was hired there was one other female RM at the Savage Depot—Barbara Struffert.  Shortly after Devin started, Struffert left Schwan's.

RMs are initially compensated with guaranteed compensation for a fixed period of time.  Over time, such pay is "stepped down" and RMs are compensated by relying more and more on a commission basis, until eventually being paid entirely by commissions earned based on sales volume.  Per a written agreement, during her first eight weeks of training, Devin was guaranteed $700 per week after which her guaranteed pay would begin to incrementally decline.  It is undisputed her step-down guarantee was in effect until she resigned.  She claims, in addition to this step-down guarantee, both Dero and Gilb verbally promised her pay would never fall below $700 per week, even after her step-down guarantee ended.  She believed her pay would be supplemented if she fell short of the $700 weekly amount and this supplemental pay

---

[1]Devin also brought claims under the Federal Equal Pay Act, 29 U.S.C. § 206, and the Minnesota Equal Pay Act, Minn. Stat. § 181.67, but does not appeal the grant of summary judgment as to these claims.

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

would continue until she achieved 100 to 120 stops on her route. The record reflects Gilb supplemented her pay during three weeks in 2003 when she did not meet the $700 goal. On three other occasions, however, she did not reach the goal and Gilb did not supplement her pay. Devin approached Gilb about the pay issue in late November when she knew her December 4, 2003, paycheck would be less than $700. Gilb responded he was not going to supplement her pay because he did not "believe [she] deserve[d] it" as her overall sales were low and she was not "making as many new customers per day as [she] could." The record indicates Gilb did supplement her December 18, 2003, paycheck, paying her $874 rather than the $695 she earned. He also agreed to extend her a written $700 per week guarantee provided she met certain performance criteria including working twelve hours of "sell time" and obtaining six new contacts each day. She was "shocked" by the offer as she did not know of other RMs being required to meet such criteria and believed they broke Department of Transportation regulations. She claims three male RMs—Ken Fistrovich, Bradley Wolberson, and David Christenson—were given weekly pay guarantees outside their training periods.

One of Devin's primary complaints is she was not assigned a Route Builder during her first eight months on a route. Route Builders are employees who accompany RMs on their routes and obtain new Schwan's customers by soliciting homes of non-customers. Gilb testified a Route Builder's primary function is to add new "route days" to an existing route in order to "tak[e] regular routes and . . . mak[e] them into split route systems that actually supported two people instead of one." Route Builders are also used to add customers to existing routes. In April 2003, when Devin was not initially assigned a Route Builder, she complained to Gilb. She claims Gilb told her she was not assigned a Route Builder because her "route was not a priority" and other routes needed it more. In May or June 2003,[3] Fistrovich was

_____

[3]Although Devin testified this conversation occurred in May or June 2003, her notes and correspondence in the record suggest it occurred in October 2003.

assigned a Route Builder. Devin claims when she asked Gilb why Fistrovich was assigned a Route Builder instead of her, he responded it was "because Mr. Fistrovich had a family to support and bills to pay." Devin reported this comment to Schwan's Human Resources Director La Verna Hovance. On December 10, 2003, Gilb did assign Devin a Route Builder. He testified he did so "[a]s soon as [he] had somebody available to top off routes." He claimed he considered Devin's route to be "first priority" because she had asked for a Route Builder on several occasions. She claims RMs Wolbersen and Dudley Thomas were assigned Route Builders before her despite the fact their routes had more customers than hers. Gilb claims these RMs and other RMs who were assigned Route Builders were working routes that were shifting "from regular routes to split routes, and [Schwan's] had to finish building the route dates." There is evidence in the record Wolbersen's route was shifting to a split route when he was assigned a Route Builder. There is no evidence to the contrary regarding Thomas's route. Fistrovich's route ultimately became a split route. Devin's route was not a split route and was not shifting to a split route. While she testified part of the Route Builder's role was to create split routes, she contends Gilb initially told her a Route Builder's role was to increase all routes to 100 to 120 stops.

Devin alleges other incidents during her tenure at Schwan's to support her claims. When she first met Gilb in February 2003, he said he "belie[ved] that [she] would not make a very good route manager and [she] should consider hostessing sampling parties."[4] Gilb later indicated, after riding with her on the route, she was "a lot tougher than [he] thought [she] would be." Finally, in December 2003, after Devin and Gilb discussed Route Builders, she claims he called her "emotionally charged." When Devin was hired, there were no available routes. She was initially trained on Wolberson's route, as he had indicated he was leaving Schwan's. This route never became available as Wolberson stayed on at Schwan's. Another

---

[4]Gilb denies making this statement and claims that, while sampling parties were hosted by RMs or Route Builders, there was never a hostess position at Schwan's.

-4-

RM—Travis—indicated he might be leaving. She claims Gilb told her, instead of guaranteeing her Travis's route, he was considering holding a skill-based contest for the route between her and the other RMs still in training. She reported this conversation to Dero, and Gilb never held the contest. In mid-March, Travis left, and on March 31, 2003, Devin was assigned his route. She believed this route was less profitable than others because it had many inactive customers. She concedes, however, this was the only route available and she specifically requested the route.

On June 26, 2003, after Devin missed a morning sales meeting, Gilb told her to "choose [her] last day at Schwan's" and said she "was not route manager material." She reported the incident to Hovance. Later that day, Gilb met with her and withdrew his request that she leave Schwan's. Devin reported they "seemed to agree that it would be in everyone's best interests if [they] set aside past issues and worked on cultivating a better working relationship." However, on July 2, 2003, Gilb gave her a written Performance Notice because she failed to meet a "new contacts" requirement.[5] On July 4, 2003, she complained to Hovance about Gilb's "disparate treatment of [her] and his negative attitude toward [her]." Following this complaint, Hovance met with her individually and later with both she and Gilb to discuss the complaints. At this meeting, Devin and Gilb agreed to "start on a fresh page."

Devin also claims she was treated less favorably than male RMs because she was not allowed to expense her pay phone calls to customers when her cell phone was out of minutes and was not given "freezer drop sales"—large sales where the residents of an apartment complex are offered discounted ice cream or treats. Christenson

_____

[5]RMs were required to "introduce themselves and Schwan's to six new people every day." These new contacts were recorded by the RMs on postcards which were turned in to Gilb at the end of the day. Wolbersen and Christenson testified they were not given warnings when they failed to meet the postcard requirement. On July 10, 2003, Mark Plombon was given a written notice for so failing. Fistrovich testified he also received written notices for failing to turn in postcards.

testified he did not receive any freezer drop sales. Wolberson testified he was given a freezer drop sale but such sales were given out as prizes for winning sales contests. Both Wolberson and Christenson testified they "expensed" pay phone calls.

At one point, Devin claims Gilb intentionally gave her a poorly organized substitute truck when her truck was being inventoried. After an RM receives a new route her truck is supposed to be inventoried. She contends her truck was not initially inventoried because, according to Gilb, the warehouse staff was too busy. When her truck was finally inventoried, she claims the substitute truck was over-packed and messy and she could not complete her route. When she called Gilb about the truck, she claims he laughed and said, "well you're the one who wanted her truck inventoried and that's what we're doing." She also contends Gilb told her she was making too many changes to her truck inventory and directed her to make changes on the warehouse computer. Wolberson and Fistrovich testified they were not directed to make inventory changes on the computer. Finally, she claims Gilb falsely told Hovance that she had twice as many customer complaints as other RMs.

In late November, Devin complained to Hovance about her pay and about a write-up she received from Gilb regarding a customer complaint. In the following weeks, she sent several e-mails to Hovance regarding her concerns. On December 12, 2003, Hovance and Vicki Schwartz, Schwan's Regional Sales Director held a conference call with her to address her complaints. When asked "what kind of resolution [she] was seeking," her response was she "wanted to be out from under a poor working environment, and was willing to transfer to meet that goal." They directed her to forward them her resume so they might find her an acceptable transfer position at Schwan's. They also explained Gilb would be attending an Equal Employment Opportunity seminar. On December 13, 2003, Devin emailed Hovance and Schwartz thanking them for their assistance. On December 20, 2003, she again emailed them, this time expressing her disappointment with their lack of responsiveness as she had not yet heard back from them. She indicated her work

-6-

environment had continued to deteriorate and she was going to file a formal complaint with the EEOC. On December 22, 2003, Schwartz responded she was "sorry for the lack of follow up" and was "working towards a resolution." She indicated she wanted to meet with Devin and Gilb to review each party's concerns and Devin's job description. She also told Devin they had forwarded her resume to Schwan's consumer brand division in Minneapolis. When Devin responded she was concerned about Gilb's presence at the meeting, Schwartz responded it was important for Gilb to attend, but offered to meet with Devin one-on-one to address her concerns.

On January 6, 2004, Devin met with Schwartz and Gilb. At the meeting, they discussed her job description and performance as well as the assignment of Route Builders. At the meeting's conclusion, Schwartz told Devin "she was confident [Devin] could succeed because [Devin] was articulate, talented, and presented [her]self well." She said "[Devin] could . . . be the best salesperson in the depot." She also told Devin she and Gilb "had confidence in [Devin's] abilities." After the meeting, Devin was disappointed because she perceived the meeting as a performance review rather than a forum to address her discrimination complaints. Although at the meeting Schwartz again told Devin she could schedule a further meeting if she still had concerns, she did not request another meeting. On January 7, 2004, she started a pre-scheduled, week-long vacation. She claims, while on vacation, Fistrovich called to inform her Gilb was "rifling in [her] truck" and was "going to use inventory issues" to "get rid" of her. Devin never reported this incident to Schwan's, and Fistrovich testified he never made the call. On January 14, 2004, Devin resigned. On October 21, 2004, she filed the instant action. The district court granted summary judgment in favor of Schwan's and this appeal followed.

II

We review the district court's grant of summary judgment de novo, affirming only if there is no genuine issue of material fact and Schwan's is entitled to judgment

as a matter of law. <u>Wallace v. Sparks Health Sys.</u>, 415 F.3d 853, 858 (8th Cir. 2005). In reviewing the evidence, we draw all reasonable inferences in favor of Devin, the non-moving party, <u>id.</u>, remaining "mindful summary judgment should seldom be utilized in employment cases." <u>Stidham v. Minn. Mining & Mfg., Inc.</u>, 399 F.3d 935, 937-38 (8th Cir. 2005).

## A. Retaliation

To establish a retaliation prima facie case, Devin must show: 1) she engaged in protected conduct; 2) a reasonable employee would have found her employer's retaliatory action materially adverse; and 3) the materially adverse action was causally linked to her protected conduct. <u>Higgins v. Gonzales</u>, 481 F.3d 578, 589 (8th Cir. 2007). The second prong is "objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions." <u>Id.</u> (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405, 2412-13 (2006) (<u>White</u>)).

Here, the district court assumed Devin engaged in protected conduct when she complained to Hovance in late June 2003 and on November 26, 2003. The court found, however, she had failed to allege a materially adverse employment action against her, and, even if she had established such an action, there was no causal relationship between her protected conduct and the alleged retaliatory actions. We agree. She alleges several retaliatory actions by Schwan's: 1) she was denied pay guarantees given to male RMs; 2) Gilb interfered with her inventory; 3) she was unfairly disciplined; 4) Gilb told Hovance she had twice as many customer complaints as other RMs ; 5) she was denied a Route Builder; and 6) her complaints were not fairly considered at the January 6, 2004, meeting. We will consider each action in turn and thereafter evaluate their cumulative force.

As an initial matter, Devin provides scant factual support for most of the alleged retaliatory actions. She claims being denied pay guarantees given to male RMs. However, the record suggests Schwan's paid her according to the step-down guarantee in her written agreement with Dero. To the extent she claims her pay was not supplemented in a few instances when it fell below $700 per week—the amount she claims Gilb and Dero orally promised she would make—she alleges no causal connection between these instances and her protected activity. Devin claims Fistrovich, Wolberson and Christenson were given pay guarantees she was not given. Our review of the record uncovers very limited evidence regarding such guarantees. She does not suggest these RMs were similarly situated to her. There is evidence these guarantees were given as either rewards for increased sales or as initial assistance after an RM shifted to a split route. More importantly, there is no evidence of a causal connection as she does not suggest being denied a requested guarantee because she engaged in protected activity. As for Devin's claim that Gilb interfered with her inventory, there is no support for this claim in the record. Devin claims Fistrovich told her he saw Gilb rifling through her truck and thought Gilb was going to use inventory issues to fire her. The most this evidence supports is that Gilb was on Devin's truck, which, without evidence of harm, cannot constitute an adverse action under White. See White, 126 S.Ct. at 2414 ("The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). To the extent she is arguing Gilb's assignment of a poorly organized substitute truck constitutes interfering with her inventory, any harm from this incident was trivial and cannot meet the White standard. Id. at 2415 ("We speak of material adversity because we believe it is important to separate significant from trivial harms. . . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

Devin also claims Gilb unfairly issued her a written notice for failing to turn in six new customer postcards and falsely reported to Hovance she had twice as many

customer complaints as other RMs. She does not allege suffering any adverse consequences because of these actions. Again, under White, retaliatory actions must be material, producing significant rather than trivial harm. Because she does not suggest these actions caused any harm, let alone significant harm, we conclude they would not have deterred a reasonable employee from engaging in protected activity.

Devin also claims the denial of a Route Builder constitutes a materially adverse retaliatory action. The district court found she had not shown Route Builders actually increased the sales or income for RMs who were assigned them. As such, she failed to show Gilb's denial of a Route Builder was materially adverse such that a reasonable employee would be dissuaded from engaging in protected activity. She argues the denial of a Route Builder is tantamount to an opportunity to build sales. While we agree the record supports evidence of some value to having a Route Builder assigned to one's route, the record is limited regarding the extent of this value. As noted above, to meet the White standard, it was her burden to show the denial of a Route Builder produced significant harm. It would follow, to meet this burden, she was required to show Route Builders had significant value. She failed to do so. She claims the testimony of Wolberson and Christenson supports the conclusion Route Builders were beneficial. Wolberson, however, testified Route Builders often signed up customers who were not actually interested in ordering from Schwan's. Christenson stated it "can be" beneficial to have a Route Builder. Nevertheless, even if having a Route Builder was beneficial, this does not establish the denial of a Route Builder was a materially significant disadvantage. Furthermore, even if we assume the denial of a Route Builder constitutes a materially adverse action, there is no evidence of a causal connection between her protected activity and the denial of a Route Builder. While an inference of a causal connection can be drawn from a close temporal connection between the employee's charge of discrimination and her employer's retaliatory action, see Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005), there is no such temporal connection here. The record suggests she first raised the issue of Route Builders in April 2003 and again in May or June 2003. As these inquiries occurred

-10-

prior to her protected activity in late June 2003, there is no inference of causal connection. In August, she again asked for a Route Builder. She engaged in protected activity on November 26, 2003, and was assigned a Route Builder two weeks later. This timeline does not support an inference of causation as there is no pattern of protected activity and swift reprisal.

Finally, Devin claims her January 6, 2004, meeting with Gilb and Schwartz constitutes a materially adverse retaliatory action. She characterizes this meeting as the culmination of Schwan's refusal to address her discrimination claims. She contends that rather than addressing them, Schwan's used the meeting to conduct a performance review. While we agree an employer's total failure to address discrimination complaints might constitute a retaliatory action sufficient to meet the White standard, the record does not support Schwan's so neglected Devin's claims. Schwan's investigated each of Devin's complaints. After her June complaint, Hovance met with her to discuss the investigation. After her November complaint, Schwartz and Hovance corresponded with her and held a conference call to address her concerns. When she so requested, Schwan's attempted to arrange a transfer within the company. At the January 6, 2004, meeting, although Schwartz did review her job description and performance, also discussed was Devin's lack of a Route Builder—one of her primary complaints. Schwartz ultimately gave her positive encouragement about her potential as an RM telling her she "could . . . be the best salesperson in the depot" and "was articulate, talented, and presented [her]self well." Although Schwartz twice told Devin she could schedule a one-on-one meeting to discuss her concerns, she never requested such a meeting. She contends Schwartz testified as to having no intention of discussing Devin's discrimination complaints at the meeting. Schwartz actually testified, while she "didn't go there to specifically discuss the things that had occurred in the past," she "[c]ertainly gave [Devin] an opportunity to, you know, ask any questions or voice any concerns when we sat down." There is no evidence Devin attempted to raise her discrimination complaints at this meeting and was overruled. Although the meeting was undoubtedly

uncomfortable for her and Schwan's might have better addressed her complaints, that is not our inquiry. We conclude a reasonable employee would not have been dissuaded from engaging in protected activity because of the January 6, 2004, meeting.

Devin also claims, when taken collectively, the above-listed actions would have dissuaded a reasonable worker from participating in a Title VII investigation or action against Schwan's. We disagree. Devin relies on Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997) and Phillips v. Collings, 256 F.3d 843 (8th Cir. 2001) for the proposition of a pattern of retaliatory conduct short of termination might constitute an adverse employment action. We note, after White, the standard for an adverse employment action in the context of a retaliation claim no longer requires the plaintiff show her employer's retaliatory conduct altered a term and condition of her employment. See White, 126 S.Ct. at 2409. This does not mean Kim and Phillips no longer apply in the retaliation context. Nothing in White precludes this court from considering an employer's actions cumulatively when determining whether a reasonable employee would be dissuaded from making a discrimination claim. Although in White, the Court considered the alleged retaliatory actions individually, id. at 2416-18, it also recognized "[c]ontext matters" when evaluating materiality. Id. at 2415. Thus, where an employer engages in extreme, systemic retaliatory conduct resulting in serious employment consequences, as in both Kim and Phillips, such conduct might very well meet the White standard. That said, the retaliatory actions Devin alleges, even taken cumulatively, do not rise to such a level.

B. Hostile Work Environment

To establish a hostile work environment claim, Devin must show: 1) she is a member of a protected group; 2) she was subject to unwelcome harassment; 3) the harassment was based on her protected status; and 4) the harassment affected a term, condition, or privilege of her employment. Turner v. Gonzales, 421 F.3d 688, 695

(8th Cir. 2005). "The harassment must be both subjectively offensive to the employee and objectively offensive such that a reasonable person would consider it to be hostile or abusive." Id. "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006) (quoting Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003)).

Here, Devin has presented no evidence of workplace conduct which rises to the level of actionable harassment. Even if we construe Gilb's isolated comments as gender-based, they simply were not severe, pervasive or demeaning enough to have altered a term, condition, or privilege of her employment. See Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-60 (8th Cir. 2004) (finding employers' "sporadic" racial slurs were insufficient to render the workplace objectively hostile); Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1159 (8th Cir. 1999) (finding two isolated, age-related comments "were not sufficiently derogatory or demeaning to permit a finding that they altered the terms of [the plaintiff's] employment"). As for her claims she was denied a Route Builder, was unfairly disciplined, was paid less than male RMs, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, they, at best, amount to a frustrating work environment rather than an objectively hostile work environment. See Bradley v. Widnall, 232 F.3d 626, 631-32 (8th Cir. 2000) (finding employer's conduct was not so severe or pervasive as to have affected a term or condition of employment where plaintiff alleged she was left out of the decision-making process, was treated with disrespect, was subjected to false complaints and her supervisory duties were curtailed); Breeding, 164 F.3d at 1159 (finding claims of unfair criticism and being yelled at did not amount to actionable harassment).

## C. Gender Discrimination

Because Devin does not have direct evidence to support her claim of discrimination, we analyze her gender discrimination claim under the McDonnell Douglas burden-shifting framework. Wells v. SCI Mgmt., L.P., 469 F.3d 697, 700 (8th Cir. 2006). "Under the McDonnell Douglas framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination." Pope v. ESA Services, Inc., 406 F.3d 1001, 1006-07 (8th Cir. 2005). To establish her prima facie case, she must show: 1) she is a member of a protected class; 2) she met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees who were not members of the protected class were treated differently. Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005). The district court found she failed to show she suffered an adverse employment action and thus did not establish her prima facie case. We agree.

"[An] adverse employment action must be one that produces a material employment disadvantage." Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016 (8th Cir. 1999). "Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge." Id. (internal citation omitted). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong." Higgins, 481 F.3d at 584. Here, Devin alleges two adverse employment actions: 1) her denial of a Route Builder and 2) her constructive discharge.

Devin first claims the denial of a Route Builder constitutes an adverse employment action because Route Builders constitute an employment benefit as they increase the number of customers on a route. Although actions short of termination may constitute adverse actions within the meaning of the statute, not everything that

-14-

makes an employee unhappy is an actionable adverse action. Montandon v. Farmland Indust., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (internal citation and quotation marks omitted). "Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case." Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). She does not argue her employment situation changed, but rather claims she was denied the employment benefit of a Route Builder. As noted above, she has failed to show this denial constitutes a materially significant disadvantage. Furthermore, she was assigned a Route Builder prior to her resignation. As such, we find this denial does not constitute an adverse employment action.

Devin next claims her resignation constitutes a constructive discharge, which establishes the adverse employment action prong of her prima facie case. "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." Baker v. John Morrell & Co., 382 F.3d 816, 829 (8th Cir. 2004). To prove constructive discharge she must show: 1) a reasonable person in her situation would find the working conditions intolerable; and 2) her employer intended to force her to quit. Tatum v. Ark. Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005). "The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment, and additionally the plaintiff must subjectively perceive the environment to be abusive." Johnson v. Runyon, 137 F.3d 1081, 1083 (8th Cir. 1998) (internal quotation omitted).

After carefully reviewing the record, we conclude Devin has failed to establish she was constructively discharged. The conduct she alleges is simply neither severe nor pervasive enough to support her claim. She specifically claims Gilb's alleged comments to her, her denial of guaranteed pay and a Route Builder, Gilb's interference with her inventory, her unfair discipline and Schwartz's criticism of her at the January 6, 2004, meeting support a finding of constructive discharge. We

-15-

disagree. Gilb's "gender-related" comments were sporadic and were not particularly demeaning or abusive. See Breeding, 164 F.3d at 1160 (holding two isolated, age-related comments "were not so demeaning or abusive as to demonstrate an intolerable working environment intended to force [the plaintiff] to quit"). Likewise, we have held feelings of being unfairly disciplined or criticized are insufficient to support a claim of constructive discharge. See Elnashar v. Speedway SuperAmerica, L.L.C., 484 F.3d 1046, 1058 (8th Cir. 2007) (holding plaintiff was not constructively discharged where the record showed only that he felt unfairly criticized and his encounters with his supervisor were unpleasant). Although she claims male RMs received Route Builders and pay guarantees she was denied, she has not shown she was similarly situated to these RMs. Furthermore, by the time of her resignation, she had been assigned a Route Builder. As noted above, her claim Gilb interfered with her inventory is not supported by the record. Finally, she points to Schwartz's comments at the January 6, 2004, meeting as evidence of constructive discharge. If anything, Schwartz's comments support Schwan's intention to retain Devin as an RM. Schwartz told Devin "she was confident [Devin] could succeed because [Devin] was articulate, talented, and presented [her]self well," Devin could "be the best salesperson in the depot," and they "had confidence in [Devin's] abilities." In addition, by this time Schwan's had twice offered to transfer Devin within the company and had forwarded her resume to a different department. This express willingness to discuss Devin's work progress and different options undercuts any claim of constructive discharge. See E.E.O.C. v. City of Independence, Mo., 471 F.3d 891, 896 (8th Cir. 2006) (holding employer's willingness to discuss other options demonstrates it did not "create a work environment so intolerable that a reasonable employee would be compelled to quit").

III

For all the foregoing reasons, we affirm the district court.

_____