77 F.3d 189
 151 L.R.R.M. (BNA) 2833, 64 USLW 2612,
5 A.D. Cases 415,
15 A.D.D. 330, 7 NDLR P 386
 John T. MILLER and AMF O'Hare Midway, Local 7011 (Local T),
American Postal Workers Union, Plaintiffs-Appellants,
v.
Marvin RUNYON, Postmaster General of the United States, and
U.S. Postal Service, Defendants-Appellees.
 No. 94-3059.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 17, 1996.
Decided Feb. 26, 1996.
 
 Robert S. Bailey (argued), Michael F. Lefkow, Chicago, IL, for John T. Miller, AMF O'Hare Midway, Local 7011 (Local T), American Postal Workers Union.
 Jonathan Haile, Tony J. Masciopinto (argued), Office of the United States Attorney, Civil Division, Chicago, IL, for Marvin T. Runyon, Jr., U.S. Postal Service.
 Before POSNER, Chief Judge, and CUDAHY and FLAUM, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 A former employee of the Postal Service, John Miller, claims that he was fired, in violation of the Rehabilitation Act, 29 U.S.C. § 791, because he is handicapped by a psychiatric disorder (he is a manic depressive); and also that an arbitrator improperly rejected a grievance that he had filed under the collective bargaining agreement between the Postal Service and the postal workers' union. The grievance was based on the same alleged misconduct by the Postal Service as the claim under the Rehabilitation Act, and the union was a coplaintiff with Miller in the challenge to the arbitration. The district judge dismissed that challenge on the defendant's motion for summary judgment. The claim of handicap discrimination went to trial, at the conclusion of which the judge found both that the claim was untimely and that it lacked merit, and so gave judgment for the defendant. There is a little more to the case, including a patently frivolous contention that the judge should have allowed Miller to amend the complaint to add a charge of retaliation, but nothing more that requires discussion.
 
 
 2
 On January 31, 1986, Miller, while at work in the Postal Service's facility at O'Hare Airport, had a manic fit. Exactly what occurred is unclear; he did not become violent or rip his clothes off but he had a wild, confused, and fearful look and was babbling incoherently. His father was summoned and took him home, and a couple of days later he was admitted to a hospital and diagnosed as manic depressive. He was placed on lithium carbonate, the standard treatment for manic depressives, and discharged from the hospital on February 12 after having been there for ten days. Two weeks later his psychiatrist wrote the Postal Service at O'Hare that Miller had been hospitalized between February 2 and 12, that he was now an outpatient of the hospital, and that he could return to work immediately. But he did not return to work. He stayed at home. According to testimony presented at trial by a different psychiatrist, Miller had entered a depressive stage of his illness and was in fact unable to work. In considerable tension with this testimony, Miller had on March 5 written the personnel office at the O'Hare postal facility requesting a transfer to another postal facility in Chicago, and the psychiatrist who was treating him had backed this up with her own letter in which she said, "I would strongly recommend, if possible, that [Miller] be assigned to another postal station. Presently John Miller is able to return to work." The Postal Service did not answer either letter, but instead on March 20 wrote Miller that he would be deemed absent without leave unless he submitted documentary evidence that he was incapacitated from working. He did not respond and on April 30 the Postal Service wrote to him terminating him, effective June 9, for abandonment of his position.
 
 
 3
 In May, Miller wrote the Postal Service, as did his psychiatrist, asking for reconsideration of its decision. He said, "I will continue to serve the United [States] Postal Service well once I am released by my doctor to return to work." The psychiatrist said, "His illness during its acute phrase prevented him from completing his required forms. Presently he is able to work at his previous assignment, however it would be in his best interest if he would be transferred to a different facility." The Postal Service requested further documentation, and the psychiatrist wrote, "I had given him permission to work in March 1986, but at that time, the fact that he had to return to the work place where he was seen in acute psychosis had a severe detrimental effect causing a continued delay in his return to work. Because he felt hopeless and overwhelmed with his life situation, he was unable to communicate with the appropriate authorities." The Postal Service was not satisfied with this response, and Miller was formally terminated on June 16, 1986.
 
 
 4
 Miller had another manic episode early in 1987, but then his condition improved and in the fall of that year he enrolled as a full-time student at Chicago State University, where he remained through the spring semester of 1988. On December 23, 1988, Miller complained, for the first time, to an equal employment opportunity counselor of the Postal Service that he had been discriminated against. It was not until March 1, 1989, almost three years after he had been fired, that he filed a formal complaint of discrimination with the Postal Service, which denied the complaint as untimely, sparking this suit. In January of 1989 he had filed the grievance that led eventually to the arbitrator's decision that he also challenges.
 
 
 5
 If Miller's administrative complaint was untimely, his suit under the Rehabilitation Act is time-barred. Tyler v. Runyon, 70 F.3d 458, 463-66 (7th Cir.1995); Rennie v. Garrett, 896 F.2d 1057 (7th Cir.1990); McGuinness v. United States Postal Service, 744 F.2d 1318, 1320 (7th Cir.1984). The applicable regulation required a complainant to bring "the matter causing him to believe he had been discriminated against within 30 [now 45, see 29 C.F.R. § 1614.105(a)(1); Johnson v. Runyon, 47 F.3d 911, 915 n. 2 (7th Cir.1995) ] calendar days" to the attention of an equal employment opportunity counselor, unless he could show "that he was not notified of the time limits and was not otherwise aware of them, [or that he] was prevented by circumstances beyond [his] control from submitting the matter within the time limits." 29 C.F.R. §§ 1613.214(a)(1)(i), (a)(4). The "unless" clause codifies the two standard defenses to statutes of limitations--equitable estoppel and equitable tolling. A defendant who through misleading representations or otherwise prevents the plaintiff from suing in time will be estopped to plead the statute of limitations. This is equitable estoppel. But even when the defendant is faultless, if the plaintiff because of disability, irremediable lack of information, or other circumstances beyond his control just cannot reasonably be expected to sue in time, the statute of limitations will be tolled until he is able through the exercise of proper diligence to file his suit. This is equitable tolling. On both defenses, see Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450-53 (7th Cir.1990).
 
 
 6
 Miller comes close to arguing that mental illness per se tolls statutes of limitations in all cases in which discrimination on the basis of that mental illness is the basis of the suit. This is tantamount to suggesting that there are no statutes of limitations in such cases, since most serious mental illnesses, such as mania, depression, and schizophrenia, are not curable, although they are treatable, and thus are lifelong affairs. With the recent generalization by the Americans With Disabilities Act of the strictures of the Rehabilitation Act to the economy as a whole, the suggestion that claims of discrimination against the mentally ill are subject to no time limitation has far-reaching implications for the liability of employers.
 
 
 7
 We see no reason, just because a suit alleges discrimination on grounds of mental illness, to depart from the traditional rule that mental illness tolls a statute of limitations only if the illness in fact prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them. Langner v. Simpson, 533 N.W.2d 511, 523 (Iowa 1995); Lawson v. Glover, 957 F.2d 801, 805 (11th Cir.1987); Helton v. Clements, 832 F.2d 332, 336 (5th Cir.1987); Dautremont v. Broadlawns Hospital, 827 F.2d 291, 296 (8th Cir.1987); Lopez v. Citibank, N.A., 808 F.2d 905, 906-07 (1st Cir.1987). Any other conclusion would perpetuate the stereotype of the insane as raving maniacs or gibbering idiots and impair their employment opportunities, thus stigmatizing Miller's own class. Most mental illnesses today are treatable by drugs that restore the patient to at least a reasonable approximation of normal mentation and behavior. When his illness is controlled he can work and attend to his affairs, including the pursuit of any legal remedies that he may have. The district judge's finding that this was Miller's situation throughout most of the period between the notification in April 1986 that he was being terminated for abandoning his job and his complaint to the equal employment opportunity counselor in December 1988, almost three years later, which stopped the running of the administrative statute of limitations, cannot be said to be clearly erroneous, and in fact strikes us as clearly correct. The thirty days expired in May 1986 and apart from a manic episode at the beginning of the following year, Miller was compos mentis for more than two and a half years before he complained to the counselor. If he could attend Chicago State University for two semesters, he could complain to an equal employment opportunity counselor. Cf. Helton v. Clements, supra, 832 F.2d at 336.
 
 
 8
 We could stop here, so far as the claim of handicap discrimination is concerned, were it not for our disquiet about the district judge's analysis, enthusiastically seconded by the government, of the merits of the discrimination claim (for remember that lack of merit was the alternative basis for the judgment in favor of the government). The judge made two points, that the defendant was not aware of Miller's handicap and that in any event the employer of a handicapped worker is never required, by way of accommodation, to transfer the worker to another job. We do not agree with either point. The repeated letters from the psychiatrist alerted the Postal Service to the fact that Miller was suffering from a mental illness. What is true, however, and shows that the judge's oversight is immaterial quite apart from the statute of limitations, is that the Postal Service did not fire Miller because of his illness. It fired him because even though his psychiatrist had pronounced him able to return to work, he did not return. Miller's superiors had no reason to believe that he was prevented from returning by his mental illness. Knowledge that an absent employee has an illness, even a serious and potentially disabling one, is not conclusive evidence that the absence is due to the illness. This would be obvious if Miller had had a heart attack, had been hospitalized for 10 days and convalescent for a month afterward, and then had been pronounced by his own doctors fit to return to work--and did not. This case is no different.
 
 
 9
 Unless his request for a transfer to another postal facility, seconded by his psychiatrist, shows that his mental illness prevented Miller from returning to his job at the O'Hare facility and, by showing this, obliged the Postal Service to make an effort to find him a similar job at another one of its facilities. The judge based his ruling that there is no duty to accommodate a disabled worker by transferring him to a different job on Fedro v. Reno, 21 F.3d 1391, 1394-95 (7th Cir.1994). But all that case holds is that the then current regulations (since changed, see id. at 1395 n. 5; 29 C.F.R. § 1614.203(g)) under the Rehabilitation Act did not require the employer to offer the disabled employee a different kind of job. The plaintiff in that case was a federal marshal who, unable because of illness to perform the duties of a marshal, asked to be made a criminal investigator. Miller, a postal clerk, did not ask to be given a different kind of job. He wanted the same job in a different facility of the same employer. Suppose that he had wanted simply to be transferred to a different floor of the Postal Service's facility at O'Hare and that the transfer could have been effected at no cost or inconvenience to the facility. We cannot think of any reason based on the Rehabilitation Act or otherwise for a rule that there is never a duty under the Act to allow such a transfer. A refusal to transfer in the case just hypothesized would be a case of arbitrarily discriminating against a handicapped worker. Alternatively--but equivalently, because the Rehabilitation Act imposes on federal agencies a positive duty of accommodation to any known physical or mental handicap of a qualified applicant or employee, as well as a purely negative duty of nondiscrimination, 29 C.F.R. § 1613.704; Fedro v. Reno, supra, 21 F.3d at 1394-95; Doll v. Brown, 75 F.3d 1200, 1203 (7th Cir.1996); Lyons v. Legal Aid Society, 68 F.3d 1512, 1514-15 (2d Cir.1995)--it would be a case of an employer's unreasonably refusing to adjust the conditions of employment to enable the handicapped worker to work. The regulations give "job restructuring" as an example of an accommodation that may sometimes be required. 29 C.F.R. § 1613.704(b)(2). A transfer to an identical job at a different facility of the same employer strikes us as rather a modest example of "job restructuring." Cf. Tuck v. HCA Health Services of Tennessee, Inc., 7 F.3d 465, 474 (6th Cir.1993); Arneson v. Sullivan, 946 F.2d 90, 92 (8th Cir.1991).
 
 
 10
 But even if Miller's claim under the Rehabilitation Act may therefore have had some merit (which we need not decide), that claim is time-barred and we turn to Miller's challenge to the arbitrator's decision. The collective bargaining agreement required the employee to present any grievance to his immediate supervisor within 14 days of first learning of the conduct (an alleged violation of the agreement) giving rise to it. That would have been around the middle of May 1986. No grievance was presented until January 1989. The arbitrator rejected the grievance as untimely. As there is no contention that a different standard of equitable tolling should be applicable to a grievance proceeding from the standard applicable to an administrative or judicial statute of limitations, we think it apparent that the arbitrator ruled correctly. And if he did not this would not help Miller. An arbitrator's award can be set aside on a variety of grounds, but error is not one of them. This is the general federal rule concerning judicial challenges to arbitral awards, and is applied regardless of the statutory basis for the challenge. Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry., 768 F.2d 914, 921 (7th Cir.1985); Richmond, Fredericksburg & Potomac R.R. v. Transportation Communications Int'l Union, 973 F.2d 276, 281 (4th Cir.1992). In this case the statutory basis is the Postal Reorganization Act, which in 39 U.S.C. § 1208(b) confers federal jurisdiction over suits between a labor organization and the Postal Service (and the union was the nominal plaintiff insofar as the suit seeks to vacate the arbitrator's award). As the statute does not prescribe a standard of review if the suit is one challenging an arbitration award, we may assume, as have the other courts that have decided challenges under the Postal Reorganization Act to arbitration awards, that the usual, very narrow standard of review is applicable. American Postal Workers Union v. United States Postal Service, 52 F.3d 359 (D.C.Cir.1995); National Post Office Mailhandlers v. United States Postal Service, 751 F.2d 834 (6th Cir.1985). It is a standard under which Miller cannot possibly prevail.
 
 
 11
 This conclusion makes it unnecessary for us to decide whether the district court's finding (which we have upheld in this opinion) that Miller's claim of discrimination was untimely would in any event, by operation of the doctrine of collateral estoppel, bar him from obtaining a favorable award from the arbitrator. The cases are few, but all but one support the bar, though the majority of these involve res judicata in the sense of claim preclusion, rather than collateral estoppel (issue preclusion), and that may make a difference, as we shall see. The outlier is National Indemnity Co. v. Farm Bureau Mutual Ins. Co., 348 N.W.2d 748, 750-51 (Minn.1984). The cases supporting the applicability of res judicata or collateral estoppel are In re Y & A Group Securities Litigation, 38 F.3d 380, 382 (8th Cir.1994); Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 985 F.2d 1067 (11th Cir.1993) (per curiam); Miller Brewing Co. v. Ft. Worth Distributing Co., 781 F.2d 494, 498-500 (5th Cir.1986); Universal Underwriters Ins. Co. v. Shuff, 67 Ohio St.2d 172, 21 O.O.3d 108, 423 N.E.2d 417 (1981), and Microwave Antenna Systems & Technology, Inc. v. Whitney-Pehl Construction Co., 23 Mass.App. 25, 498 N.E.2d 1059, 1061-62 (1986)--plus dicta in our own Dickinson v. Heinold Securities, Inc., 661 F.2d 638, 644 (7th Cir.1981), quoted approvingly in Liskey v. Oppenheimer & Co., 717 F.2d 314, 318 (6th Cir.1983). Cf. Monmouth Public Schools v. Pullen, 141 Ill.App.3d 60, 95 Ill.Dec. 372, 489 N.E.2d 1100, 1103-05 (1985). The issue is left open in Local 863 Int'l Brotherhood of Teamsters v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 534 n. 2 (3d Cir.1985), and helpfully discussed in 4 Ian R. MacNeil, Richard E. Speidel & Thomas J. Stipanowich, Federal Arbitration Law: Agreements, Awards, and Remedies under the Federal Arbitration Act § 39.5 (1994).
 
 
 12
 It might seem that the scope of judicial review of arbitration awards is so limited that whether an arbitrator should or should not apply collateral estoppel would be academic, since error, as we have noted, presumably including an error in applying or failing to apply the doctrine of collateral estoppel, is not a ground for vacating the award. This is true when the issue arises in a challenge to the arbitrator's award. See R.M. Perez & Associates, Inc. v. Welch, 960 F.2d 534, 539-40 (5th Cir.1992); Marshall v. Green Giant Co., 942 F.2d 539, 550 (8th Cir.1991); Local 863 Int'l Brotherhood of Teamsters v. Jersey Coast Egg Producers, Inc., supra, 773 F.2d at 534. But if the party opposing arbitration on grounds of collateral estoppel asks the court to enjoin the arbitration before there is any award, or by simply refusing on the ground of collateral estoppel to arbitrate precipitates a motion by the other party to compel arbitration, the court will have to decide whether to refuse to order arbitration, which is a different question from whether to vacate an arbitration award.
 
 
 13
 The majority position reflects the view that the preclusive effect of a judgment is determined by the tribunal that rendered it. E.g., Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R., 24 F.3d 937 (7th Cir.1994). The implication is that it would be up to the federal courts in this case to determine the effect of the district court's judgment on a subsequent arbitration. Given the contractual nature of arbitration, it can be argued that the preclusive effect of either a judicial judgment or an arbitration award on a subsequent arbitration should depend on what the parties agreed to. HRH Construction Corp. v. Bethlehem Steel Corp., 45 N.Y.2d 675, 412 N.Y.S.2d 366, 368, 384 N.E.2d 1289, 1292 (1978); Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R., supra, 24 F.3d at 940. And then the court will decide as a matter of interpretation of the parties' arbitration clause (see Matterhorn, Inc. v. NCR Corp., 763 F.2d 866, 873 (7th Cir.1985)) whether the arbitrators can ignore a prior judicial judgment. But a distinction must be made between res judicata and collateral estoppel. The former precludes entire claims, the latter the relitigation of specific issues. When all that a party is seeking is not to bar but merely to constrain the arbitrator, he may not (or may--we cannot find a case) be able to obtain injunctive or other judicial relief in advance of the arbitration--relief designed to narrow the issues that the arbitrator may consider--and so may have to take his chances on persuading the arbitrator to apply collateral estoppel. Cf. HRH Construction Corp. v. Bethlehem Steel Corp., supra, 412 N.Y.S.2d at 366, 384 N.E.2d at 1290.
 
 
 14
 We need not pursue these interesting questions further in the present case. The answers would not change the outcome.
 
 
 15
 AFFIRMED.