# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1916

_____

Dr. Penny M. Wilkie,

          Appellant,

v.

Department of Health and
Human Services,

          Appellee.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   District of North Dakota.
\*
\*
\*
\*

_____

Submitted: November 15, 2010
Filed: April 27, 2011

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Dr. Penny M. Wilkie filed suit against the United States Department of Health and Human Services ("the Department"), alleging, *inter alia*, that the Department violated her rights under Title VII of the Civil Rights Act of 1964. Specifically, Dr. Wilkie asserted that the Department violated her rights to (1) be free of sexual harassment and gender discrimination; (2) be free of a hostile work environment; (3) equal treatment in her place of employment; (4) enjoy the rights, privileges, and protections provided to all employees by the hospital policies, medical-staff bylaws, and all applicable state and federal laws and regulations; and (5) be free of recrimination and retaliation in her place of employment as a result of her reporting

others' wrongdoing. The district court[1] granted the Department's motion to dismiss claims involving misconduct that occurred before June 18, 2005, because Dr. Wilkie failed to exhaust her administrative remedies. Additionally, the district court granted summary judgment to the Department on Dr. Wilkie's claims for hostile work environment, constructive discharge, sex discrimination, and retaliation. Dr. Wilkie appeals, and we now affirm.

## I. *Background*

From December 31, 2000, to March 17, 2006, Dr. Wilkie served as the clinical director at Quentin Burdick Memorial Health Care Facility ("Clinic") in Belcourt, North Dakota. The Department operates the Clinic.

According to Dr. Wilkie, in 2003, Todd Bercier, the administrative officer and acting chief executive officer (CEO) of the Clinic at relevant times, began making sexually suggestive comments to her. Dr. Wilkie testified that "[t]here were a couple comments that [Bercier] had made, you know, like, oh, I've always thought you were attractive since high school, and making reference to we should just go to like run off to Venezuela." According to Dr. Wilkie, in 2004, Bercier rubbed his foot against her foot while they were in a meeting with Linus Everling, the CEO at that time. After the meeting, Dr. Wilkie told Everling what occurred, but he "said he didn't witness or see anything, and he said if [Dr. Wilkie] didn't put it in writing, then nothing—it didn't happen." Dr. Wilkie did not submit a complaint in writing.

Dr. Wilkie stated that Bercier, while intoxicated, would call her at home. In 2004, he came to her home unannounced on two or three different occasions. In the fall of 2004, Dr. Wilkie came home and found Bercier sleeping naked in her bed with a red, sheer cloth over one of her lamps and a bottle of alcohol next to the bed. Dr.

---

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

-2-

Wilkie testified that she slept on the sofa that night and woke Bercier up the next morning when his wife called wondering why he had spent the night at Dr. Wilkie's home. Later that morning, Bercier called the emergency room where Dr. Wilkie was working to apologize to her, and Dr. Wilkie told him to "just forget it." According to Dr. Wilkie, she then told Bercier for the first time that his conduct was unwelcome and inappropriate. Dr. Wilkie stated that people in the community were calling her names because of the incident; however, she did not report the incident because she was embarrassed. When asked whether she had any concerns for her own safety or well-being, Dr. Wilkie replied, "When he was coming to my home and how he got into my home, yeah I did." After the incident in the fall of 2004, Bercier never again called Dr. Wilkie or came to her home. According to Dr. Wilkie, she spoke to several CEOs about Bercier being impaired at work but never mentioned to them that Bercier came to her home.

Dr. Wilkie testified that on July 20, 2005, Bercier withheld information from her regarding one of her subordinates, Dr. Plasse. Dr. Plasse had taken pharmaceuticals from the emergency room. According to Dr. Wilkie, Bercier told another subordinate, Dr. Earls, not to tell Dr. Wilkie because she and Dr. Plasse were having an affair. Bercier also purportedly stated that Dr. Wilkie was under psychiatric care.

On August 2, 2005, Dr. Wilkie first contacted an Equal Employment Opportunity (EEO) counselor. When asked "what were the actions that [she] alleged as harassing in the EEO complaint," Dr. Wilkie responded, "When—I think what really upset me is when [Bercier] didn't inform me that—of missing pharmaceuticals from the emergency room that Dr. Plasse supposedly had taken, and he had made comments to Dr. Earls not to tell me because I was having a sexual relationship with Dr. Plasse." Bercier was the acting CEO while LaVerne Parker, the CEO at the time, was absent from the Clinic. After filing the EEO complaint in August 2005, Dr. Wilkie testified that Bercier "seemed hostile." She believed that Bercier "was

-3-

monitoring or stalking" her at the Clinic during the week that Parker was absent. According to Dr. Wilkie, "it . . . made my life miserable." Dr. Wilkie testified that Bercier "accus[ed] [her] of being . . . hostile with the staff, accus[ed] [her] of basically not doing [her] job, [and] being incompetent."

Bercier's alleged hostile conduct in August 2005 and thereafter included the following incidents. First, Bercier attended a medical staff meeting regarding a new medical record system and made comments that Dr. Wilkie believed were "inappropriate" and "uncalled for" to her and other members of the medical staff. Second, Bercier questioned Dr. Wilkie regarding comments that she had made to a coworker. Third, Bercier contacted Dr. Wilkie about the inefficiencies involved with allowing a physician to monitor the time it took to transfer medical charts. Fourth, Bercier referred patients with complaints about the pharmacy to Dr. Wilkie. Dr. Wilkie testified that she "couldn't take it anymore." Nancy Davis, "the acting or deputy director at the time," granted Dr. Wilkie leave to speak with a counselor with the employee assistance program.

On November 14, 2005, Dr. Wilkie sent Parker an email that stated:

> I have contacted Vina Bohling for a request for Transfer—I should not have to put up with the continued undermining of individuals in this organization. I do not get the support I need as Clinical Director. I do not wish to leave this service unit as I have several ties to the community, if things do no[t] change th[e]n I feel forced to leave.

Dr. Wilkie explained in the email that the "continued stress and hostile environment [was] causing [her] undue stress jeopardizing [her] physical well being." According to Dr. Wilkie, Parker told her that she could arrange a transfer.

On February 15, 2006, Dr. Plasse and Dr. David Lau called a meeting of members of the medical staff to address Dr. Wilkie's position as clinical director. The

medical staff had removed the previous clinical director. The Clinic's bylaws set forth a procedure permitting medical staff to assemble and vote a no-confidence vote. A majority of the medical staff voted to remove Dr. Wilkie as clinical director. According to Dr. Wilkie, proper procedures for the vote were not used, and both Dr. Plasse and Dr. Lau undermined her authority by calling the meeting. Dr. Wilkie testified that the "no confidence" vote "destroyed [her] ability and responsibilities as clinical director in supervising the medical staff." But, during this time period, she was not "having any difficulties" or "feel[ing] threatened or under any pressure from Todd Bercier." To Dr. Wilkie's knowledge, Bercier "did not participate in the meeting."

After finding out about the "no confidence" vote, Dr. Wilkie immediately reported the vote to Parker. After the "no confidence" vote, several doctors verbally complained to Parker about Dr. Wilkie, and Parker sent Dr. Wilkie a letter about the complaints. Parker also requested assistance from the human resources department in Aberdeen, South Dakota. At about that same time, Dr. Wilkie submitted a request to Parker to attend a continuing education course in Las Vegas, Nevada. Parker denied the request.

On March 17, 2006, Dr. Wilkie resigned for "many, many multiple reasons." According to Dr. Wilkie:

> A lot of my concern was with how I was being just basically brushed aside as clinical director and my responsibilities were not being seriously taken or being accused of not doing my job, which I still don't understand what I did wrong, and in how patient care was jeopardized by having administration bring providers into the facility that were never cleared by the medical staff, and yet I just don't understand how that could be just not looked at and taken seriously when you're dealing with patients. You just don't allow somebody to walk in your facility and start working on human beings without having something in their file.

How I was brushed aside and not told about missing pharmaceuticals from the facility and this is a department that I'm responsible for. How administration could just totally ignore policies and procedures of our facility that are there for a reason to prevent chaos from happening and also to ensure that our facility is accredited with joint commission, Medicare/Medicaid services, and yet they can be totally ignored.

How biased the investigation was that only certain members of the medical staff were solicited for negative comments, and people that went to speak on my behalf were dismissed, and that was—those conversations were never recorded or given to my supervisor.

Dr. Wilkie testified that Bercier was, in part, one of the reasons that she resigned. She reported the alleged harassing conduct that occurred in 2004 *after* she submitted her resignation in March 2006.

On April 2, 2007, Dr. Wilkie filed a complaint in federal district court. In response, the Department filed a motion to dismiss and a motion for summary judgment. The district court granted the Department's motion to dismiss Dr. Wilkie's Title VII claim, finding that the court lacked subject matter jurisdiction due to Dr. Wilkie's failure to exhaust administrative remedies. The district court denied the Department's motion to dismiss as it related to the tort and constitutional claims and held such claims in abeyance pending a final decision from the Merit Systems Protection Board (MSPB).

On July 24, 2008, an administrative law judge for the MSPB issued its initial decision finding that Dr. Wilkie failed to show that her resignation was involuntary and dismissing Dr. Wilkie's appeal "as outside the Board's appellate jurisdiction." Dr. Wilkie filed a petition for review asking the MSPB to reconsider the initial decision. The MSPB issued a final order denying the petition for review and concluding that "there is no new, previously unavailable evidence and that the administrative judge made no error in law or regulation that affects the outcome."

On November 21, 2008, Dr. Wilkie filed a new complaint in federal district court claiming that she had exhausted her administrative remedies and reasserting the causes of action set forth in her original complaint: (1) violation of the rights guaranteed to her by Title VII; (2) intentional infliction of emotional harm; (3) negligent infliction of emotional harm; (4) denial of her First and Fourteenth Amendment rights; (5) defamation of her character and libel and slander to her personal and professional reputation; and (6) violation of her rights as a whistle blower.

The Department again filed a motion to dismiss and motion for summary judgment. The district court initially dismissed Dr. Wilkie's non-Title VII claims. Thereafter, the district court granted the Department's motion to dismiss claims involving misconduct that occurred before June 18, 2005, for Dr. Wilkie's failure to exhaust her administrative remedies. Additionally, the district court granted summary judgment to the Department on Dr. Wilkie's claims for hostile work environment, constructive discharge, sex discrimination, and retaliation.

## II. *Discussion*

On appeal, Dr. Wilkie argues that the district court erred in finding that (1) her Title VII claims regarding conduct that occurred before June 18, 2005, were barred by her failure to seek counseling from the EEO within 45 days of the offensive conduct; (2) her allegations of discriminatory conduct and constructive discharge failed to raise a genuine issue of material fact as to hostile work environment and sexual harassment; (3) she failed to present a prima facie case of gender discrimination under Title VII; and (4) she failed to establish that her employer retaliated against her for complaining of gender harassment.

We review the district court's grant of a motion to dismiss and motion for summary judgment de novo. *Trooien v. Mansour*, 608 F.3d 1020, 1026 (8th Cir. 2010). A district court properly grants dismissal "if it appears beyond doubt that the

plaintiff can prove no set of facts which would entitle him to relief." *Id.* (quotation and citation omitted). A district court properly grants summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

## A. *Exhaustion of Administrative Remedies*

Dr. Wilkie asserts that her sexual harassment claim based on events occurring in 2004 are not time barred because (1) the offender was a part-time CEO that she feared because he had the power to terminate her; (2) the offender committed at least one act of sexual harassment after the bar date; and (3) the offender's harassment caused her such mental trauma warranting an extension of the bar date.

In response, the Department argues that the district court correctly found that Dr. Wilkie's claims for misconduct that occurred before June 18, 2005, are time barred. According to the Department, Dr. Wilkie failed to report the incidents in 2004 within 45 days of their occurrence and instead waited approximately a year before making contact with an EEO counselor. The Department maintains that Dr. Wilkie failed to timely report the incidents within 45 days of their occurrence and asserts that the 2004 allegations are not similar in nature, frequency, and severity to the 2005 allegations. Consequently, the district court correctly dismissed these claims because Dr. Wilkie failed to exhaust administrative remedies.

A Title VII plaintiff must exhaust his or her administrative remedies before bringing discrimination claims. *Bailey v. U.S. Postal Serv.*, 208 F.3d 652, 654 (8th Cir. 2000). An employee of a federal government agency who thinks that he or she has "been discriminated against 'must consult a[n EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter.'" *Id.* (quoting 29 C.F.R. § 1614.105(a)). The employee "'must initiate contact with a Counselor within 45 days

of the date of the matter alleged to be discriminatory.'" *Id*. (quoting 29 C.F.R. § 1614.105(a)(1)). Where an employee "can show that he 'was not notified of the time limits and was not otherwise aware of them,'" he or she "may be absolved from any failure to comply with the 45-day filing deadline." *Id*. (quoting 29 C.F.R. § 1614.105(a)(2)).

### 1. *Mental Condition*

But "[t]he same regulation that imposes the requirement of contacting an EEO counselor provides that the time limit shall be extended when the complainant was prevented by circumstances beyond his or her control from contacting the counselor within the specified time." *Jessie v. Potter*, 516 F.3d 709, 714 (8th Cir. 2008) (citing 29 C.F.R. § 1614.105(a)(2); *Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir. 1996)). "[M]ental disability can be a ground for equitable tolling generally in federal law." *Id*. For example, "courts have held that mental disability can toll the time in which an employment discrimination claimant must file a discrimination suit, file an administrative complaint, or contact an EEO counselor." *Id*. (internal citations omitted).

We have held that "a plaintiff seeking tolling on the ground of mental incapacity must come forward with evidence that a mental condition *prevented him from understanding and managing his affairs generally and from complying with the deadline he seeks to toll*." *Id*. at 715 (emphasis added). "Courts that have allowed equitable tolling based on mental illness have done so only in exceptional circumstances, such as where the complainant is institutionalized or adjudged mentally incompetent." *Lyons v. Potter*, 521 F.3d 981, 983 (8th Cir. 2008). We have observed "that the standard for tolling due to mental illness is a high one." *Id*.

In *Jessie*, we rejected the appellant's tolling argument based on mental incapacity, noting that although one of the medical opinions that the appellant submitted mentioned "depression," the opinion "g[ave] no further information that

would shed light on whether the depression affected her ability to understand her legal rights or act upon them." 516 F.3d at 715. Furthermore, the appellant failed to file any "medical records or opinions indicating that she was deprived of her reasoning faculties or was incapable of understanding or managing her affairs." *Id*.

Here, to support her claim of mental incapacity, Dr. Wilkie relies on the testimony of Dr. Kathleen Hughes-Kuda, a psychiatrist who opined that Dr. Wilkie "seemed pretty stressed and depressed" during the period of 2003 to 2005. Dr. Hughes-Kuda also testified that she personally witnessed Bercier's intrusions at Dr. Wilkie's home and saw the stress and depression that the intrusions caused Dr. Wilkie. Dr. Wilkie also relies on the testimony of John Wegerle, a friend, who testified that Dr. Wilkie was depressed and stressed during this time period.

But, as in *Jessie*, neither Dr. Hughes-Kuda's nor Wegerle's testimony satisfies the high standard for tolling due to mental incapacity. Like in *Jessie*, the testimony "describing her disabilities mentions 'depression,' but it gives no further information that would shed light on whether the depression affected her ability to understand her legal rights or act upon them." 516 F.3d at 715. And, Dr. Wilkie "has filed no medical records or opinions indicating that she was deprived of her reasoning faculties or was incapable of understanding or managing her affairs." *Id*.

Accordingly, Dr. Wilkie's claim for equitable tolling based on mental incapacity fails.

## 2. *Continuing Violation*

Dr. Wilkie also argues that the 2004 incidents involving Bercier are not time barred because her claims are based on a continuing violation that did not end until she resigned in March 2006.

[A] Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period . . . . A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. Neither holding, however, precludes a court from applying equitable doctrines that may toll or limit the time period.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *see also Betz v. Chertoff*, 578 F.3d 929, 937–38 (8th Cir. 2009) (applying the *Morgan* standard to the 45-day period in 29 C.F.R. § 1614.105(a)); *Lyons v. England*, 307 F.3d 1092, 1106 n.6 (9th Cir. 2002) ("Although the circumstances in which 29 C.F.R. § 1614.105(a)(1) may be equitably tolled are no doubt broader than the tolling opportunities under [42 U.S.C. § 2000e-5(e)], we find that the mandatory nature of the federal regulation is sufficient to warrant full application of the *Morgan* rule.").

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within [45] days of the date of the act or lose the ability to recover for it." *Morgan*, 536 U.S. at 110. But

[t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

*Id.* at 117 (footnote omitted).

No legal requirement exists "that the employee [must] file a charge prior to [45] days 'after' the single unlawful practice 'occurred.'" *Id.* at 118. Because

the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within [45] days of any act that is part of the hostile work environment.

*Id.*

Here, "[b]ecause [Dr. Wilkie's] charge alleged a hostile work environment—a claim based on the 'cumulative effect of individual acts'—[her] hostile work environment claim was timely if 'an act contributing to [the] claim occur[ed] within the filing period . . . .'" *Rowe v. Hussmann Corp.*, 381 F.3d 775, 779 (8th Cir. 2004) (quoting *Morgan*, 536 U.S. at 115, 117). "This determination requires that we consider 'whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.'" *Id.* (quoting *Morgan*, 536 U.S. at 120). "[A]cts before and after the limitations period [that are] *so similar in nature, frequency, and severity* . . . must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to th[e] action." *Id.* at 781 (emphasis added).

Here, Dr. Wilkie has failed to show how Bercier's alleged misconduct in 2004 is "so similar in nature, frequency, and severity" to the misconduct occurring in July 2005 and thereafter. *See id.* As the district court noted, the "harassing acts" that occurred in 2004 were substantially different than those that occurred in 2005. The

2004 acts can be characterized as "sexual advances" and include Bercier coming to Dr. Wilkie's home while intoxicated, making comments regarding the two dating, playing footsie with Dr. Wilkie, pointing a laser at her inappropriately, and entering Dr. Wilkie's home and passing out naked in her bed.

By contrast, the 2005 acts did not involve personal, sexual advances made upon Dr. Wilkie by Bercier or any other coworker. The alleged harassment was markedly different, including (1) Bercier withholding information from her relating to one of her subordinates, Dr. Plasse, taking pharmaceuticals from the emergency room; (2) Bercier telling another subordinate, Dr. Earls, not to tell Dr. Wilkie about the pharmaceuticals theft because Dr. Plasse and Dr. Wilkie were having an affair and Dr. Wilkie was under psychiatric care; (3) Bercier attending a medical staff meeting and making comments that Dr. Wilkie felt were confrontational to her and others; (4) Bercier questioning Dr. Wilkie about comments that she had made to a coworker; (5) Bercier contacting Dr. Wilkie about her inefficiencies monitoring physicians and the time it takes to transfer medical charts; (6) Bercier referring patients with complaints regarding the pharmacy to Dr. Wilkie; (7) Dr. Plasse and Dr. Lau calling a meeting of members of the medical staff to address Dr. Wilkie's position as clinical director, resulting in a no confidence vote; (8) several doctors verbally complaining to Parker about Dr. Wilkie, and Parker sending Dr. Wilkie a letter regarding the complaints; (9) the interviewing of several staff members regarding Dr. Wilkie's job performance; and (10) Parker denying Dr. Wilkie's leave to attend a continuing medical education course in Las Vegas.

Based on this record, we conclude that the tolling exceptions to the 45-day time limit do not apply. Therefore, the district court did not err in holding as a matter of law that Dr. Wilkie failed to exhaust administrative remedies regarding the alleged misconduct that occurred before June 18, 2005, which was 45 days prior to Dr. Wilkie's first contact with an EEO counselor.

B. *Hostile Work Environment/Sexual Harassment*

Dr. Wilkie next asserts that the district court impermissibly weighed the evidence in concluding that she failed to prove that the alleged sexual harassment affected a term, condition, or privilege of her employment and that her employer knew or should have known of the harassment and failed to take prompt remedial action.

> To establish a *prima facie* claim of hostile work environment by non-supervisory co-workers, a plaintiff must show (1) that she belongs to a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on her membership in a protected group; (4) that the harassment affected a term, condition, or privilege of her employment by creating a hostile work environment; and (5) that the employer knew or should have known about the harassment and failed to take proper remedial action.

*Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010).

Dr. Wilkie satisfied the first two elements of her prima facie case. With regard to the third element, Dr. Wilkie must establish that the harassment was based on her gender. As explained *supra*, we will not consider the 2004 incidents of Bercier's misconduct because they are time barred. And, we agree with the district court that Dr. Wilkie has failed to show how the 2005 incidents, with the exception of Bercier's comment to Dr. Earls that Dr. Wilkie and Dr. Plasse were having an affair, qualified as harassment based upon gender. *See McDonnell v. Cisneros*, 84 F.3d 256, 259–60 (7th Cir. 1996) ("Unfounded accusations that a woman worker is a 'whore,' a siren, carrying on with her coworkers, a Circe, 'sleeping her way to the top,' and so forth are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that she is a woman, they could constitute a form of sexual harassment."). For purposes of this appeal we will assume, without deciding, that the allegation that Bercier spread a rumor that Dr. Wilkie was having

-14-

an affair with Dr. Plasse is harassment based on Dr. Wilkie's gender thus satisfying the third element of the prima facie case. *See id.*

Dr. Wilkie must also prove "that the harassment affected a term, condition, or privilege of her employment by creating a hostile work environment." *Cross*, 615 F.3d at 981. We have previously noted that "[t]he standard for demonstrating a hostile work environment on the basis of sexual harassment is a demanding one" and that "Title VII does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Id.* (quotation and citations omitted). "[M]erely rude or unpleasant" conduct is insufficient to support a claim; instead, "[a]ctionable conduct must . . . be extreme." *Id.* "A plaintiff must establish that discriminatory intimidation, ridicule, and insult permeated the workplace." *Id.* We consider the totality of the circumstances in deciding whether a plaintiff demonstrated a hostile work environment. *Id.* Factors we consider include "the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance." *Id.*

We find, as a matter of law, that Bercier's alleged rumor-spreading "was not [harassment] so severe or pervasive that it met the high threshold for a hostile work environment." *See id.* As the district court noted, this single act of discriminatory conduct is "insufficient to establish that the work environment was so permeated with discriminatory conduct that it altered a term, condition, or privilege of her employment." *Id.* "Numerous cases have rejected hostile work environment claims premised upon facts equally or more egregious than the conduct at issue here." *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872, 874 (5th Cir. 1999) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, repeated touching of plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile work environment claim); *Adusumilli v. City of Chi.*,

164 F.3d 353, 357, 361–62 (7th Cir. 1998) (holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–24, 826 (6th Cir. 1997) (reversing jury verdict and holding behavior merely offensive and insufficient to support hostile environment claim when employee reached across plaintiff, stating "[n]othing I like more in the morning than sticky buns" while staring at her suggestively; suggested to plaintiff that parcel of land be named "Hootersville," "Titsville," or "Twin Peaks"; and asked "weren't you there Saturday night dancing on the tables?" while discussing property near a biker bar); *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993) (holding no sexual harassment when plaintiff's supervisor asked plaintiff for dates, asked about her personal life, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her twice at work and once in a bar)).

C. *Constructive Discharge*[2]

Dr. Wilkie also contends that the district court erred in finding as a matter of law that she voluntarily resigned and was not constructively discharged as a result of the harassment.

> Hostile work environment and constructive discharge claims may be wholly distinct causes of action under Title VII. The claims have different elements, and, while a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a tangible employment action.

---

[2]Although Dr. Wilkie's complaint did not allege constructive discharge, the district court noted that on March 10, 2006, Dr. Wilkie sent Parker a letter that stated, "I am submitting this letter as formal notification of constructive discharge . . . ."

-16-

*Winspear v. Cmty. Dev., Inc.*, 574 F.3d 604, 607 (8th Cir. 2009) (quotation and internal citations omitted).

> To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force her to quit. An employee must, however, grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment.

*Anda v. Wickes Furniture Co.*, 517 F.3d 526, 534 (8th Cir. 2008) (quotations, alterations, and internal citations omitted).

"[Dr. Wilkie] premises her constructive discharge claim on the same allegations we found insufficient to establish a hostile work environment. As such, her claim fails." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 811 (8th Cir. 2008) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than an actionable hostile work environment].")); *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270–71 (10th Cir. 2004) (recognizing that a plaintiff has a higher evidentiary burden when seeking to establish a constructive discharge than an adverse employment action)).

## D. *Sex Discrimination*

According to Dr. Wilkie, the district court erred in finding that she failed to present a prima facie case of sex discrimination because Bercier's sexual harassment constituted sex discrimination. She maintains that Bercier's false accusations that she was having an affair with Dr. Plasse and was under psychiatric care could easily be viewed by a reasonable juror as intending to disparage her because of her rejection of his sexual overtures.

To establish a prima facie case of Title VII sexual discrimination, Dr. Wilkie must prove that she (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of the protected class. *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005).

The Department does not challenge the district court's finding that Dr. Wilkie established the first two elements of her prima facie case. It asserts that the district court correctly concluded that Dr. Wilkie failed to prove that she suffered an adverse employment action and was treated differently than similarly situated males.

> An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge. Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action.

*Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) (internal quotations, alterations, and citations omitted).

Here, neither party disputes that the Department never terminated Dr. Wilkie, cut her pay or benefits, or changed her job duties or responsibilities. And, as explained *supra*, Dr. Wilkie's claim for constructive discharge fails. Therefore, Dr. Wilkie is unable to show that she suffered an adverse employment action, an essential element of her prima facie case, and her claim for sex discrimination fails.

E. *Retaliation*

Finally, Dr. Wilkie argues that the district court erred in finding that she failed to establish that the Department retaliated against her for complaining of gender harassment. She admits that "the evidence of Dr. Wilkie's complaining to her employer specifically of 'gender harassment' does not jump off the page as does the evidence of her expressly complaining of other hostile acts." She asserts that express complaints would not have done any good and that management certainly knows of Bercier's conduct now and still lets him keep his position as CEO. According to Dr. Wilkie, she complained directly to Bercier that his conduct was inappropriate and unwanted and also reported his sexual harassment to the previous CEO. She states that she asked Parker not to put Bercier in charge when Parker was absent and that she did report Bercier coming to work impaired by drugs and alcohol to Parker.

To establish a prima facie case of Title VII retaliation, Dr, Wilkie must demonstrate that "1) she engaged in protected conduct; 2) a reasonable employee would have found her employer's retaliatory action materially adverse; and 3) the materially adverse action was causally linked to her protected conduct." *Devin v. Schwan's Home Serv., Inc*., 491 F.3d 778, 785 (8th Cir. 2007).

Dr. Wilkie's retaliation claim necessarily fails because, as explained *supra*, she has not demonstrated that the Department took a materially adverse action against her.

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

-19-